IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re:                                                    Case No.: 16-2272-JCO
CHARLES K. BRELAND,                                        Chapter 11
JR.,
Debtor.

MEMORANDUM OPINION AND ORDER
ON MOTIONS TO DISMISS, OR IN THE ALTERNATIVE,
APPOINTMENT OF A CHAPTER 11 TRUSTEE

This matter (hereinafter "*Breland, II*") is before the Court on Creditor Levada EF

Five, LLC's ("Levada") Motion to Dismiss or in the Alternative Appointment of a

Chapter 11 Trustee (Docs. 22, 65, 173, 184); Creditors Hudgens & Associates, LLC

("H&A") and Equity Trust Company as Custodian for the Benefit of David E. Hudgens

IRA #41458's (together with H&A referred to as "Hudgens Creditors") Motion to

Appoint a Chapter 11 Trustee, (Doc. 190) to which Debtor filed his Omnibus Brief in

Opposition thereto (Doc. 122) and the Bankruptcy Administrator's (hereinafter "BA")

Response thereto.  (Doc. 293).  Also before the Court is Debtor's own Motion to Dismiss

(Doc. 312), and the BA's Response in Opposition.  (Doc. 332).

Over the course of three days, October 31, November 21 and 22, 2016, the Court

heard testimony regarding the above motions from multiple witnesses: Mr. Breland's

CPA, Mark Hieronymous; Creditor William J. Donado; Robert (Bob) Galloway, counsel

for Debtor in his previous 2009 Chapter 11 case, and from Mr. Breland himself.  At the

conclusion of the hearing, the Court requested the parties submit proposed findings of

fact and conclusions of law, which they did. (Docs. 282, 289). These matters are now under submission and ripe for adjudication.

For the record, this Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 1334 and 157, and the Order of Reference by the District Court dated August 25, 2015. This is a core proceeding pursuant to 28 USC § 157(b)(2), and this Court has the authority to enter a final order.

In making its findings herein, the Court considered the record before it, the evidence and the testimony presented at the hearings, as well as the arguments of counsel. Having considered all of the above, the Court concludes that Levada's Motion to Dismiss is due to be and hereby is DENIED. Debtor's Motion to Dismiss is likewise DENIED. The Hudgens Creditors' Motion to Appoint a Chapter 11 Trustee is due to be and hereby is GRANTED for the following reasons.

<u>FINDINGS OF FACT</u>

*Background*

On March 9, 2009, Debtor (or alternately referred to as "Mr. Breland"), filed a Chapter 11 case, Case No. 09-01139 in this Court (*Breland, I*). The Hudgens Creditors were creditors in *Breland,* I, also. On July 8, 2016, Mr. Breland filed the present case, *Breland, II,* along with the companion case of *In re Osprey Utah, LLC,* 16-2270-JCO (hereinafter, "*Osprey*"), both in this Court. To date, a proposed plan of reorganization has not been filed in either case. The largest creditors in *Breland, II* are the Hudgens Creditors, Levada, and the Internal Revenue Service ("IRS"), which have claims totaling $9,988,487.25. The only creditors in *Osprey* are William and Linda Donado (the "Donados"), Levada, and Parsons, Kinghorn & Harris, P.C. with claims totaling

$2,647,696.00.

*The Hudgens Lawsuit*

The claims of the Hudgens Creditors in *Breland, II* arise out of a dispute between the Hudgens Creditors and Mr. Breland regarding the amount allegedly due them under the *Breland, I* Plan of Reorganization. (Doc. 138 at 1-2, ¶¶ 3 – 8). In *Breland, I*, the Hudgens Creditors filed Claims 23, 24, and 25. Claim 23 was filed by H&A in the amount of $2,334987.08; Claim 24 by Equity Trust Company Custodian for the Benefit of David E. Hudgens IRA #41457 (IRA #41457) in the amount of $879,929.55; and Claim 25 by IRA #41458 in the amount of $180,498.37. The record of *Breland, I* reflects that Mr. Breland did not object to any of these three claims, and did not list a claim against any of these three creditors as an asset of that Chapter 11 estate. (Doc. 138 at 1, ¶ 3-4). In negotiating his plan of reorganization, Mr. Breland settled the claims of the Hudgens Creditors, and the alleged terms of that settlement were incorporated into the *Breland, I* Plan. Because the interpretation of the terms of this settlement are bitterly disputed between Mr. Breland and the Hudgens Creditors, no finding as to the validity of those issues is made herein, as those issues are not before this Court at this time.

Mr. Breland's plan was confirmed, and, the Hudgens Creditors sought post-confirmation enforcement of that plan from this Court.[1] Mr. Breland successfully contested the enforcement on the grounds that the appropriate forum for enforcing the Plan was state court, and that this Court did not have jurisdiction to do so, and, if it did, that it should abstain from enforcing the Plan.

On March 6, 2014, the Hudgens Creditors filed *Equity Trust Company as*

---

[1] The majority of *Breland, I* was presided over by the now retired Bankruptcy Judge Margaret A. Mahoney.

3

*Custodian for the Benefit of David E. Hudgens IRA No. 41458 and Hudgens & Associates LLC v. Charles K. Breland*, Case No. CV-2014-900631, in the Circuit Court of Mobile County, Alabama, (the "Hudgens Lawsuit"), seeking to enforce the *Breland, I* Plan which required Mr. Breland to pay the Hudgens Creditors $1,080,000.00 when distributions were made to other creditors, and to deliver a note and mortgage securing a reduced claim amount of $1,500,000. Mr. Breland, claiming defenses to the Hudgens Creditors' claims, denied the allegations of the Complaint and filed a counterclaim and third party complaint against the Hudgens Creditors, and David E. Hudgens individually, claiming, among other things, that the H&A claim filed in *Breland, I* was fraudulent.

On September 17, 2015, the Circuit Court of Mobile County entered an order ruling that the Hudgens Creditors were not entitled to a mortgage on 508 acres in Grand Bay, Alabama, as the Hudgens Creditors had claimed, but granted them a judicial lien against approximately 376 acres of that land. (Doc. 138 at 2, ¶ 9). Prior to that order, on November 20, 2012, Mr. Breland transferred the 508 acres to Gulf Beach Investment of Perdido, LLC, ("Gulf Beach"), and on October 24, 2014, Gulf Beach transferred approximately 400 acres of it to Grand Oaks Plantation, LLC ("Grand Oaks"). On December 18, 2016, the Hudgens Creditors filed an appeal of the portion of the September 17, 2016 Order denying them a mortgage on the entire 508 acres. After obtaining relief from the stay from this Court to proceed with that appeal, the Alabama Supreme Court rendered its February 2, 2017 Opinion that the Mobile County Circuit Court exceeded its discretion in entering Al. R. Civ. P. 54(b) certification on the grounds that the facts of that appeal hinged on facts inextricably intertwined with the facts of the remaining pending claims, and separate adjudications would lead to

4

piecemeal appellate review of the same facts and issues if the Supreme Court were to review the present appeal and then later be presented with an appeal from a judgment adjudicating the pending claims.

On December 15, 2015, the Hudgens Creditors argued a motion for summary judgment for the amounts they claimed were due them under Section 3.2.3 of the *Breland, I* Plan. (Doc. 138 at 3, ¶ 10). On March 24, 2016, the Mobile County Circuit Court granted that motion in favor of the Hudgens Creditors in the amount of $2,189,342.96, plus costs and interest from December 15, 2015. (*Id.*). On March 17, 2016, Mr. Breland filed a notice of appeal of this judgment and requested the Mobile County Circuit to stay the collection of the judgment while the appeal was pending. (*Id.* at ¶ 11). The stay was denied. Mr. Breland then asked the Alabama Supreme Court to stay the collection of the judgment until the appeal was resolved; that request was also denied. (*Id.*).

The Hudgens Creditors recorded Certificates of Judgment on March 29-30, 2016 in the records of the Judge of Probate of Mobile County, Alabama. On May 18, 2016, the Hudgens Creditors filed a fraudulent transfer lawsuit against *inter alia,* Mr. Breland and numerous Breland related entities in the Circuit Court of Baldwin County, Alabama.[2] On November 1, 2016, and on motion of the parties, the case was placed on that court's administrative docket for twelve months.

*The Levada Lawsuit*

Levada has claims in *Breland, II* and *Osprey* which arise out of a contract between Mr. Breland and Levada relating to real property in Utah owned by entities that

---

[2] Case No.: CV-2016-900524

5

Case 16-02272   Doc 382   Filed 04/28/17   Entered 05/01/17 09:30:16   Desc Main
Document      Page 5 of 34

Mr. Breland owned. (Doc. 138 at 4, ¶ 15). Under the contract, Osprey Utah acquired certain mineral and royalty interests in the property located in Utah (the "Utah Property") from entities owned by Mr. Breland. The Utah Property was conveyed to Osprey Utah via two deeds (the "Osprey Utah Deeds"). (*Id.*) On April 3, 2014, Mr. Breland and Osprey Utah filed an action against Levada for breach of contract in the United States District Court for the Southern District of Alabama[3] (the "Levada Lawsuit"). On February 26, 2015, Levada filed a counterclaim. (*Id.*). Approximately one year later, on February 3, 2016, the jury in the Levada Lawsuit returned a verdict in favor of Levada against Osprey Utah and Mr. Breland in the amount of $1,420,671.02. On the day of the jury verdict, the district judge entered an order stating that judgment would be entered separately in accordance with the jury verdict after the amount of attorneys' fees was determined. (*Id.*). The District Court calculated the award of attorneys' fees, including statutory pre-judgment interest, and on April 28, 2016, entered a final judgment in the amount of $2,397,695.94 in favor of Levada and against Mr. Breland and Osprey Utah, jointly and severally. (Doc. 138 at 4, ¶ 17).

On July 6, 2016, Osprey Utah and Mr. Breland filed a notice of appeal of the judgment in the Levada Lawsuit and requested that the District Court stay the execution of the judgment while the case was on appeal. (*Id.* at ¶18). The District Court denied the stay; Mr. Breland and Osprey Utah did not post a bond to supersede the judgment. (*Id.*). Two days later, on July 8, 2016, the present Chapter 11 bankruptcy was filed. The failure to post a supersedeas bond and the subsequent filing of the present bankruptcies is an

---

[3] Case No.: 1:14-cv-00158-CG-C

6

issue of contention between the Debtor and his creditors, and has generated significant motions and multiple settings on that issue.

*The Donado Lawsuit*

On September 2, 2014, a number of Mr. Breland's entities filed *Utah Reverse Exchange, LLC, et al. v. Linda Donado, et al.,* Case No.:1:14-cv-00408 in the United States District Court for the Southern District of Alabama (the "Donado Lawsuit") against Linda and William Donado ("the Donados"). (Doc. 138 at 5, ¶ 19). The Donados filed an amended counterclaim, which included Osprey Utah, LLC as a defendant. Part of the case was tried to a jury and part was a bench trial. The case was tried to a jury from February 16-18, 2016. The jury returned a verdict against Osprey Utah, LLC and other defendants on July 18, 2016, in the amount of $250,000.00. The claims tried by bench trial resulted in a 25% mineral interest to the Utah Property being awarded to the Donados. On March 1, 2017, Mr. Breland and the other of his entities involved in this suit filed an appeal of the final judgment with the Eleventh Circuit Court of Appeals, Case No.: 17-10943. A suggestion of bankruptcy was filed on March 8, 2017, and this appeal was stayed pending stay relief from this Court. A supersedeas bond was not filed in conjunction with the appeal.

*Pre-Breland, II Transfers*

During the last six months of 2015, Mr. Breland caused a number of new limited liability companies to be formed (the "New Entities"). (BEX 17-22; Doc. 313 at 166-169, 176).[4] When he formed them, Mr. Breland owned the New Entities individually,

---

[4] "BEX" refers to exhibits submitted by the Debtor In Possession. "MEX" refers to exhibits submitted by Movants Levada and Hudgens Creditors. Doc. 316 is the hearing transcript for the October 31, 2016 hearing, Doc. 313 is the hearing transcript for the

(*Id.*), but effective January 1, 2016, he transferred ownership of the New Entities and CKB Minneola, LLC,[5] to Osprey Holdings, LLC. (Doc. 313 at 197-199). Mr. Breland is the 100% owner of Osprey Holdings, LLC. (Doc. 175 at 1).

From February 1-4, 2016, Mr. Breland executed the following six deeds from him, individually, to the New Entities, and executed a deed to his wife (collectively "the Deeds").

On February 1, 2016, Mr. Breland executed a deed transferring an income-producing commercial property described as Lot 1, Westbrook Commercial Park, Daphne, Alabama, to Osprey Kommerzielle, LLC. That deed was recorded on February 3, 2016. (Doc. 138 at 5 ¶ 22).

On February 1, 2016, Mr. Breland executed a deed transferring a commercial building described as Lot 3, Westbrook Commercial Park, Daphne, Alabama, to Osprey Hund Esser Haus. That deed was recorded on February 3, 2016. (*Id.* at ¶ 23).

On February 4, 2016, Mr. Breland recorded a deed from himself to his wife, Yvonne Breland, transferring his one-half interest in a house and property at Lakewood Club Estates, Point Clear, Alabama in which he and his wife live. Mr. Breland executed this deed on February 1, 2016. (*Id.* at ¶ 28).

On February 4, 2016, Mr. Breland executed and recorded a deed from himself to Osprey Kommerzielle transferring commercial property described as Lot 2, Jubilee Mall Subdivision, Daphne, Alabama. (*Id.* at ¶ 30).

---

November 21, 2016 hearing, and Doc. 314 is the hearing transcript of the November 22, 2016 hearing.
[5] CKB Minneola, LLC is a Florida limited liability company owned by Mr. Breland. The LLC owns a lease to CVS Pharmacy which generates approximately $12,000.00 per month in rents. (Doc. 316 at 206).

On February 4, 2016, Mr. Breland executed and recorded a deed from himself to Osprey Kommerzielle transferring residential property described as Lot 1, William O'Neal Addition to Daphne, Alabama. (*Id.* at ¶ 31).

On February 4, 2016, Mr. Breland executed and recorded a deed from himself to Osprey Kommerzielle transferring commercial property described as Lot 5, Southside Business Park, Fairhope, Alabama. (*Id.* at ¶ 34).

On February 5, 2016, Mr. Breland recorded a deed from himself to Osprey Punkt Loschen, LLC transferring the Battles Wharf Property. This deed was executed by Mr. Breland on February 1, 2016. On August 8, 2016, Mr. Breland and Osprey Punkt Loschen executed a correction deed to limit the property conveyed to Osprey Punkt Loschen to approximately 10 acres that Mr. Breland had been trying to fill and develop since at least 2008 but had been unable to fill because of opposition from the City of Fairhope. (*Id.* at ¶ 36).

When Mr. Breland executed the Deeds in early February of 2016, the summary judgment motion filed by the Hudgens Creditors for the Money Judgment had already been argued, a jury trial in the Levada Lawsuit was commencing on February 1, 2016 (the day Mr. Breland began executing the Deeds) in which there was a substantial counterclaim against him (MEX 8, 16, 17), and a jury trial was to begin on February 16, 2016, in the Donado Lawsuit, including the Donados' counterclaims, with the jury being selected on February 2, 2016. (MEX 25, 26).

Around noon on February 3, 2016, the jury in the Levada Lawsuit rendered a $1,420,671.02 verdict against Mr. Breland. (Doc. 138 at 4 ¶ 17; MEX 17. Within hours of the rendition of that jury verdict, Mr. Breland began recording the Deeds. (MEX 28,

47).  During his testimony before this Court, Mr. Breland justified those transactions and recordations by characterizing them as being recommended by his CPA, and as being ordinary-course-asset-protection-actions of a real estate developer to protect his properties against potential tort claims that might arise in the course of the operation of his real estate business.  However, this Court finds that characterization less than genuine in light of the following facts:

Mr. Breland's own testimony demonstrated that he had owned all six of the properties transferred to the New Entities for many years, some more than fifteen years, without having transferred them out of his individual name.  More than four years prior to the transfers, Mr. Breland's accountant, Mr. Hieronymous, testified that he advised Mr. Breland to put the properties into separate LLCs to provide liability protection, yet Mr. Breland did not follow his accountant's instructions.  (Doc. 316 at 74-75).  In 2012, three years prior to when the transfers were actually made, Mr. Breland was advised again by his attorney and his accountant to make the transfers.  (*Id.* at 74-75, 84-85).  At this point, a holding company was formed and deeds were prepared to accomplish the transfers, but the transfers were never made.  (*Id.*).  In fact, Mr. Breland did not execute the deeds until the week the trial commenced in the Levada Lawsuit, and did not record the deeds until after the jury verdict was rendered, despite being repeatedly advised to do so by his attorney and accountant.  (MEX 28, 30, 38, 41, 43, 45).  Contrary to his accountant's advice that residential and commercial property not be placed in the same LLC, Mr. Breland transferred his office building (parts of which he leases out), Lot 2, Jubilee Mall (a vacant commercial lot), Lot 5 Southside Business Park (a vacant commercial lot), Lot 1, William O'Neal Addition to Daphne (a single family residence

that has never been rented out) into to Osprey Kommerzielle, LLC ("Osprey K"). (Doc. 316 at 88-89; MEX 28, 30, 38, 41, 43).

When questioned about his delay in making the recommended transfers, Mr. Breland stated under oath that the reason for the delay was because he was busy getting ready for trial during the three weeks prior to trial. (Doc. 316 at 130-133). No explanation was given as to why he did not execute and deliver the Deeds in the three plus years prior to the trial.

Mr. Breland testified that he transferred his one-half interest in his house to his wife as a result of a settlement agreement with his wife in a divorce proceeding she filed and dismissed in 2012. (DEX 35, 36; Doc. 316 at 227-228). The purported consideration by his wife for the transfer was the withdrawal of her pursuit of obtaining a divorce. (*Id.*) There is no writing evidencing that agreement, and the bona fides of that testimony are drawn into question because the transfer was made on the day after the jury verdict in the Levada Lawsuit, and almost three and one-half years after the divorce proceeding was dismissed.

Notably, this transfer was made to Mr. Breland's wife less than one year prior to the *Breland, II* petition. The transfer also appears to have been made almost simultaneously with the recordation of a mortgage on the house in favor of Eigenkapital, which mortgage Mr. Breland testified was given to secure a proposed loan that ultimately was never made. Mr. Breland continues to reside in the house. (Doc. 316 at 235-250).

*First Community Bank Loan*

On February 12, 2016, Mr. Breland caused Osprey K and Osprey Hund Esser

Case 16-02272    Doc 382    Filed 04/28/17    Entered 05/01/17 09:30:16    Desc Main
Document    Page 11 of 34

Haus ("Osprey H")(another entity he owned until January 1, 2016) to enter into a credit agreement with First Community Bank under which Osprey K and Osprey H were approved to borrow up to $950,000 (the "Line of Credit"). (MEX 33-35). Mr. Breland guaranteed that debt. (MEX 36).

The security for the Line of Credit was Lots 1 & 3, Westbrook, which Mr. Breland had only days before conveyed to Osprey K and Osprey H, respectively. (MEX 28, 30, 34). Thus, it appears that Mr. Breland encumbered those assets to shield them from execution.

*Eigenkapital Karl, LLC*

Eigenkapital Karl, LLC ("Eigenkapital") has been a point of contention throughout this case. The Court notes that Mr. Breland's testimony in general was elusive, but particularly so when Eigenkapital was addressed.

Mr. Breland caused Eigenkapital Karl, LLC to be formed on April 15, 2015 with him as its manager or managing member. (MEX 54). Currently, Wasalan Ltd. ("Wasalan") is the manager of Eigenkapital. (Doc. 313 at 42, 44). Even though Mr. Breland, by his own testimony, is the owner of either 99% or 100% of Wasalan and is its President or one of its directors, he could not affirmatively state on the record which position he holds due to alleged lack of knowledge or memory. (*Id.*). Wasalan's address on the Nevada Secretary of State website is the address for Mr. Breland's office post office box. (MEX 55; Doc. 316 at 159). Mr. Breland's office is also the depository of Eigenkapital's business organizational documents. (MEX 55).

Despite not knowing his own position in the structure and administration of Wasalan, Mr. Breland was able to affirmatively state that Wasalan owns 10% of

Eigenkapital and that he believes William R. Miller owns 3% of Eigenkapital. Mr. Breland claimed that he did not know who owns the other 87% of Eigenkapital, despite the fact that he was the organizer of Eigenkapital, has a 99-100% ownership interest in the manager of Eigenkapital, has his post office box as the mailing address for Eigenkapital's manager, and his office is the depository for Eigenkapital's business organization records. (Doc. 313 at 44, 57, 62, 67). The Court finds this alleged lack of knowledge to be suspect.

Again, despite not knowing who owns the other 87% of the LLC, Mr. Breland did know that Eigenkapital owns the outstanding balance of a debt owed by Shores of Panama, Inc., in the original principal amount of approximately $19,000,000 secured by mortgages on property owned by several of his affiliated entities. However, Mr. Breland claimed under oath that he did not know the outstanding balance of that debt. (Doc. 313 at 28-34, 83-84). This mortgage is not reflected on Mr. Breland's 2015.3 Reports, and Wasalan is assigned no value in his schedules.

After being specifically ordered to include Eigenkapital on his 2015.3 reports, despite his close relationship with Eigenkapital, and almost nine months after he filed *Breland, II*, Mr. Breland purports to the Court that he *still* does not know enough about Eigenkapital to provide the information required by Rule 2015.3. (Doc. 257 at 150).

On May 12, 2015, Mr. Breland executed a $100,000.00 promissory note and a mortgage in favor of Eigenkapital on a house then jointly owned by Mr. Breland and his wife. (MEX 48). That mortgage was not notarized until February 3, 2016, the day the jury verdict was rendered in the Levada Lawsuit. (*Id.*). The mortgage was recorded within two and one-half hours after the jury verdict was rendered. (*Id.*). After testifying

in his 341 meeting that Eigenkapital loaned approximately $500,000 secured by that mortgage, Mr. Breland now claims that that mortgage was all a mistake – that Eigenkapital never loaned him any money. Yet, as of April 26, 2017, the mortgage continues to encumber the home. (Doc. 316 at 235-240, 246, 252-253).

Mr. Breland's schedules do not show any indebtedness to Eigenkapital even though he testified at his 341 meeting that he owed Eigenkapital $400,000.00 - $500,000.00. (MEX 72; Doc. 76).

On February 13, 2017, counsel for the IRS filed a Motion to Compel the Debtor to file his 2015.3 Report for Eigenkapital. (Doc. 265). A hearing was held on this Motion and Mr. Breland was given 48 hours to comply with this Court's prior order to file his 2015.3 Report regarding Eigenkapital, or his case would be dismissed without further notice. On March 29, 2017, Mr. Breland complied by filing an affidavit stating again that he lacked knowledge regarding Eigenkapital and that he relied on his in-house CPA, Lori Globetti and outside consultant, William Miller, to prepare the affidavit to the best of their information and belief. (Doc. 292 at 2). The affidavit states that William Miller reached out to several attorneys who might have additional information to provide, but that his efforts resulted nothing. (*Id.*). The affidavit states that neither Eigenkapital nor any of its members were found to have an open checking account, and no other similar transactional documents were available. (*Id.*). The names of those persons or entities contacted were not provided in the affidavit, yet Mr. Breland does state that to his knowledge, the residual interests of Eigenkapital are held by Casper Holdings, LLC and Osprey RDB, LLC. (*Id.* at 3). Mr. Breland swore under the penalty of perjury that he and his staff have not established any checking account or

14

other business account on behalf of Eigenkapital, and, in general, have received very little documentation regarding the entity since its formation.  (Doc. 292 at 3-4).  Given his relationship with Eigenkapital through Wasalan, Breland's testimony that he cannot obtain information on Eigenkapital is not credible.

*Fraudulent Transfer Action*

Upon learning of Mr. Breland's February 1 – 5, 2016 transfers, the Hudgens Creditors, on May 18, 2016, filed a fraudulent transfer lawsuit (the "Fraudulent Transfer Lawsuit") in the Baldwin County, Alabama Circuit Court[6] against Mr. Breland, the New Entities, Yvonne Breland, Eigenkapital, and others seeking to recover Mr. Breland's February transfers. (MEX 14).  Most of the defendants in the Fraudulent Transfer Lawsuit are owned directly or indirectly by Mr. Breland and those that are not directly or indirectly owned by him are related to Mr. Breland either as members of his immediate or close family or as entities owned by members of his close family.

Pursuant to 11 U.S.C. § 362, the Fraudulent Transfer Lawsuit was stayed when *Breland, II* was filed.  On July 20, 2016, the Hudgens Creditors demanded that Mr. Breland pursue the fraudulent transfer claims that the Hudgens Creditors had asserted in the Fraudulent Transfer Lawsuit.  (MEX 15).  Mr. Breland refused to pursue those claims, causing the Hudgens Creditors to file a motion for authority with this Court to pursue those claims.  (Doc. 98 at 2).  The Court is withholding a ruling on that motion pending the outcome of these hearings.

*Failures To Disclose or Inaccuracies in Disclosures*

Mr. Breland's Schedule of Assets and Liabilities and Statement of Financial

---

[6] Circuit Civil Case No.: CV-2016-900524.

Affairs were due on July 22, 2016, but the Court extended that deadline to August 9, 2016. (Docs. 19, 20).

Mr. Breland did not file his Schedule of Assets and Liabilities and Statement of Financial Affairs on August 9, 2016, but, instead, filed an incomplete Schedule of Assets and Liabilities and Statement of Financial Affairs on August 10, 2016. (Docs. 4, 31).

When *Breland, II* was filed, Mr. Breland was, and still is, engaged in litigation with the IRS concerning pre-*Breland, I* tax liabilities. (MEX 6, 51, 52; Doc. 313 at 205-209; Doc. 314 at 178-180). In 2012, Mr. Breland filed two lawsuits in the U.S. Tax Court, Docket No. 21940-12 disputing tax assessments for 2004, 2005, and 2008, and Docket No. 21946-12 disputing tax assessments for 2009. (MEX 6, 51, 52; Doc. 313 at 205-209). Neither of those lawsuits is disclosed in his Statement of Financial Affairs. (MEX 72; Doc. 78). Further, he lists the IRS as a disputed claim in the amount of $1.00, but, undoubtedly, he has some knowledge regarding the amount of the IRS claim. The IRS has filed a claim in the present case in the amount of $5,401,448.25. (MEX 72; Doc. 76 at 2; Proof of Claim 2-2 at 2).

Likewise, in both his original and amended Statement of Financial Affairs, Mr. Breland did not disclose the February 2016 conveyances of his real property to the New Entities and to his wife. (Doc. 43 at 8 ¶18).

Mr. Breland's initial Fed. R. Bankr. P. Rule 2015.3 Report was due on July 26, 2016, in order for it to be available to creditors before the first setting of Mr. Breland's § 341 creditors' meeting. Even though the § 341 meeting was continued to August 17, 2016, and completed on August 24, 2016, the report was not filed prior to the

16

conclusion of the § 341 meeting.

On September 20, 2016, almost two months after his first 2015.3 report was already due, Mr. Breland filed a motion to, among other things, excuse his failure to file and excuse him from filing the initial July 26, 2016 Report. (Doc 121.) The Court heard the motion, denied that request and required Mr. Breland to file quarterly 2015.3 Reports, including a report up to June 30, 2016, and to include information concerning Eigenkapital in those reports. (Doc 193).

The three 2015.3 Reports Mr. Breland has filed to date do not contain any information relating to Eigenkapital, are so internally inconsistent and so inconsistent with other information filed or testified to by Mr. Breland as to be virtually useless to his creditors and this Court. Additionally, the Reports show numerous transfers of money between his various entities, some of which are at best questionable and at worst fraudulent.

Using the December 31, 2016 Report, but noting that many inconsistencies set out herein are common to all the Reports in the record, the Court found extensive and material errors and inconsistencies:

1. As noted above, as of January 31, 2017, and as late as March 28, 2017, Mr. Breland still claimed to have insufficient information to report on Eigenkaptial's assets and liabilities. (Doc. 257 at 150; Doc. 285).

2. The "Asset Values" for all entities are not updated despite changes in values on the balance sheets.

3. Osprey Holdings, LLC's 2015.3 financial information shows a $16,000 indebtedness of S. Hickory, Inc. to Osprey Holdings, LLC and a $40,000

17

indebtedness of Breland Corporation to Osprey Holdings as liabilities of Osprey Holdings instead of as assets.  (Doc. 257 at 9).

4. Florencia Development's financial statements show a $440,000 "Note Receivable – Gulf Beach Inv Co of Perdido" to Florencia Development, Inc. but Gulf Beach's information shows no indebtedness to Florencia.  (Doc. 257 at 54, 138).  It also shows an indebtedness of $5,500 owed by it to Mr. Breland, but Mr. Breland's schedules do not show Florencia as a creditor.  (Doc. 257 at 54; Doc. 75).

5. Osprey H's 2015.3 financial information shows a $26,792 debt to Mr. Breland but Mr. Breland's schedules do not show a corresponding asset. (Doc. 257 at 20; Doc. 74).

6. Osprey P's 2015.3 financial information shows the real property owned by it as having a value of $1,091,700 but Mr. Breland has repeatedly testified that it has a value of approximately $300,000.  (Doc. 257 at 25-28; Doc. 316 at 180).

The June 30, 2016 2015.3 Report shows:

1. Breland Corporation's 2015.3 financial information says Mr. Breland owes Breland Corporation $38,953.87 but Mr. Breland's schedules do not show Breland Corporation as a creditor.  (Doc. 175 at 5; MEX 72; Doc. 76).

2. Osprey K's 2015.3 financial information shows it owes Mr. Breland $17,880 but Breland's schedules do not show a corresponding asset.  (MEX 72; Doc. 74; Doc. 175 at 17).

3. Osprey H's 2015.3 financial information reduces its value because of a $545,500 mortgage payoff but does not show any indebtedness secured by that mortgage.

18

(Doc. 175 at 22-23, 26).

4.  S. Hickory's 2015.3 financial information shows a $299,000 vendor's lien indebtedness owed to Gulf Beach but Gulf Beach's 2015.3 information does not show that indebtedness as an asset.  (Doc. 175 at 90, 145).

5.  Breland testified that Wasalan Ltd. owns a 10% interest in Eigenkapital.  (Doc. 313 at 57).  On the Entity Value section of Wasalan's 2015.3 financial information, the value of that 10% interest in Eigenkapital is shown as $240,000.00, but that value is not shown as an asset on Wasalan's balance sheet. (Doc. 175 at 156-157).

6.  B & B Orange Beach Development, LLC's financial information does not show a BP claim as an asset, but its September 30, 2016 2015.3 Report shows that B&B Orange Beach collected $26,762.00 for a BP settlement. (Doc. 175 at 113; Doc. 191 at 111).

7.  Grand Oaks Plantation, LLC's 2015.3 financial information shows that it owns 413.67 acres in Grand Bay, Alabama with a value of $1,117,900.00, but Mr. Breland testified it owned 440 acres with a value of $4,400,000.00.  (Doc. 175, p 139; Doc. 316 at 196).

8.  CKB Minneola, LLC's 2015.3 financial information shows a $100,000 "Increase in Due from S. Hickory Inc" but its balance sheet does not show any indebtedness of S. Hickory as an asset.  (Doc. 175 at 151-153).  Further, CKB Minneola's 2015.3 financial information shows a $51,750 "Increase in Due to Charles K. Breland" but CKB Minneola's balance sheet does not show any debt owned by Mr. Breland to CKB Minneola. (*Id.*)

9. Osprey K's 2015.3 Report of financial information shows that it owes Breland $17,880.00, but Mr. Breland's schedules do not show any debt of Osprey K to him. (Doc. 191 at 16; MEX 72; Doc 74). It also shows a $1,316.00 "Increase in Due to Charles K. Breland" but the balance sheet shows no increase from the indebtedness to Mr. Breland shown in Osprey K's financial information on its June 30, 2016 2015.3 Report. (Doc. 175, p 17; Doc. 191 at 16, 18). There is also a notation of a $1,500 "Increase in Due to CKB Minneola LLC" but the balance sheet shows no liability to CBK Minneola. (*Id.*).

10. S. Hickory's 2015.3 financial information shows a $7,132.00 indebtedness due to it from CKB Minneola but CKB Minneola's information does not show any indebtedness to S Hickory. (Doc 191 at 88, 148).

11. Gulf Beach's 2015.3 Report shows an "Investment in Grand Bay 10, LLC" with a value of $126,800, (Doc. 191 at 143), that was not shown in Gulf Beach's financial information on the June 30, 2016 2015.3 Report for it. (Doc. 175 at 145). Gulf Beach's September 30, 2016 income statement does not show an expenditure that could be for that investment, its balance sheet does not show any indebtedness used to acquire that interest, its "Entity Value" calculation does not include any value for that investment, its cash flow reconciliation shows a $0 "Increase in investment in Grand Bay 10 LLC", and there is no financial information for Grand Bay 10, LLC in the 2015.3 report filed for September 30, 2016. (Doc. 191 at 143-5). This Report also shows an indebtedness of $10,500 to Breland Corporation that is not included in Mr. Breland Corporation's assets. (Doc. 191 at 5, 143).

These inconsistencies are a mere drop in the bucket of inconsistencies that can be found throughout the 2015.3 Reports and in the record, all of which demonstrate that Mr. Breland is not fully and accurately reporting to the Court the disposition and whereabouts of the assets, liabilities, and income of each of the entities affiliated with him since the filing of the present Chapter 11.

*Unauthorized and Inappropriate*
*Payments and Actions During Breland, II*

Mr. Breland uses broad categories of income and expenses on his BA-1 reports which prevent his creditors from understanding the discrepancies that exist in those reports. For example, his August 2016 BA-1 Report (Doc. 104) lists expenses in three categories – "cashiers ck to bankruptcy court;" "Utilities, maintenance, recurring expenses;" and "Medical Exp. Donations, Other" for expenses totaling $62,218.30. The BA-1 Report for September 2016 has three categories – "Utilities, Maintenance;" "Recurring Exp. Consulting;" and "Legal Fees;" for a total of $67,515.37. The October 2016 BA-1 Report has three categories – "Utilities, Maintenance;" "Recurring Exp. Consulting;" and "Other/Misc/Trustee Fees" for a total of $32,933.18. It bears noting that Mr. Breland claims to personally have no real property, and virtually no personal property, yet expenses for maintenance and utilities consistently show up in his BA-1 Reports anyway.

*Payments Made Without Court Approval*

On August 10, 2016, Breland withdrew $28,862.78 from the *Breland, II* DIP account. (Doc. 105 at 1; MEX 90). Breland testified that he did not remember the reason or purpose for that withdrawal. (Doc. 314 at 117). The accounting records of the U.S. Bankruptcy Court Clerk show that on August 12, 2016, that same amount was deposited

21

with the Clerk for *Breland, I*. *See* U.S. Bankruptcy Court Clerk Account record in *Breland, I*. Pursuant to this Court's order of September 13, 2016 in *Breland, I*, the Clerk disbursed approximately $1,350,000.00 out of the *Breland, I* bankruptcy estate to the United States on account of its *Breland, I* claim. (*Breland, I* Doc. 967). The $28,862.78 which came from the *Breland, II* DIP account was additional accrued interest paid to the IRS on its *Breland, I* claim. This payment to the IRS from the *Breland, II* estate occurred more than two months after *Breland, II* was filed, and without approval of the Court.

A $5,800 payment to Gonzalez-Strength & Assoc. for structural engineering services for one of Debtor's companies which Debtor thought was Grand Oaks. Gonzalez- Strength was not listed as a creditor in Debtor's schedules. Mr. Breland could not testify whether it was for pre-petition or post-petition work. Mr. Breland did not request or receive permission to employ or pay it. (Doc. 313 at 215-217).

*Unapproved post-petition professional services payments*

At the time of the payments described in this subparagraph, no payments to any professionals have been approved by the Court except for a $50,000 retainer to the McDowell Knight law firm. No consultant has been approved by the Court to provide consulting services to Mr. Breland. Despite that lack of approval, Mr. Breland has paid (i) $1,870 for post-petition legal services to Stone, Granade, Crosby, a law firm that, as of the date of these hearings, the Court has not been asked to approve, and has not approved, to perform post-petition legal services; (ii) at least $28,800 to MCA Capital, LLC, MHH, LLC, and Construction Services, LLC; and (iii) payments to Thomas

Crowther of $5,841.40 and $5,242.25 for post-petition legal work for Osprey Utah.[7]  Mr. Breland could not identify any specific services MCA Capital, LLC, MHH, LLC, and Construction Services, LLC, provided and testified that the invoices he received did not describe when the services were performed. However, it bears noting that each of companies are owned by William R. Miller who is Mr. Breland's "consultant" and who has an office in Mr. Breland's office suite.  (Doc. 313 at 199-205, 217-222).

At some time prior to filing the September 30, 2016 Report, Gulf Beach acquired an interest in Grand Bay 10, LLC in the amount of $126,800.00.  (Doc. 191 at 143).  This investment is not reflected in the June 30, 2016 2015.3 Report, instead, only an "Increase in Investment in Grand Bay 10 LLC" in the amount of $1,800.00 is shown.  (Doc. 175 at 145-147).  The only references to it in the September 30, 2016 2015.3 Report are on the Balance Sheet and Income Statement for Gulf Beach listing an "Increase in Investment in Grand Bay 10 LLC" in the amount of $0.  (Doc 191 at 143-4).  There is no indication on the September 30, 2016 2015.3 Report showing the source of the funds for that $126,800.00 investment.

*Post-Briefing Indicia of Lack of Trustworthiness*

Since the hearings concluded on these motions, Mr. Breland's creditors have repeatedly been forced to seek help from the Court in getting Mr. Breland to disclose the information required by this Court's orders.  Specifically, counsel for the IRS had to file a Motion to Compel Mr. Breland to file adequate 2015.3 Reports for Eigenkapital Karl, LLC.  (Doc. 265).  Mr. Breland was given 48 hours to file the Report, and did so but with the previously mentioned affidavit that this Court finds deficient.  (Doc. 292).

---

[7] On April 25, 2017, Debtor filed an Application to Employ Thomas N. Crowther as Debtor's Counsel, *nunc pro tunc.*  (Doc. 365).

Likewise, on March 30, 2017, the Hudgens Creditors filed a motion requesting judicial review of seemingly unjustified and improperly documented acquisitions and dispositions of various assets by Mr. Breland and his affiliates entities. (Doc. 296). On April 3, 2017, this Court, concerned by Mr. Breland's apparent breach of his fiduciary duties, granted the Motion without a hearing, (Doc. 304), and required Mr. Breland to obtain court approval prior to the acquisition or disposition of any asset of the estate or of any of the affiliates included in the 2015.3 Reporting requirements. Despite having just argued in court on March 28, 2017, that it was in the creditors' best interests for Mr. Breland to remain in bankruptcy, Mr. Breland filed an Expedited Motion to Dismiss on April 6, 2017, a mere three days after this Court's Order was entered, on the grounds that the Court's order imposes an "extreme hardship" causing the "shut down" of the "financial and business operations of Debtor and the Affiliates in the ordinary course." (Doc. 312).

In response to Debtor's Motion to Dismiss, the Bankruptcy Administrator filed an opposition to the dismissal stating that it is apparent that Mr. Breland "does not like to follow the rules and wants to be able to operate freely while in Chapter 11 with little or no oversight by the court or parties in interest." (Doc. 332 at 3). The BA further stated that Mr. Breland voluntarily sought protection under Chapter 11, but has not been willing to submit to the authority of the Court to accomplish the goals of bankruptcy—to reorganize and provide an opportunity for a fresh start for the debtor and the repayment of the creditors.

<u>CONCLUSIONS OF LAW</u>

Upon commencement of a bankruptcy case, all the debtor's property passes to the

estate. 11 U.S.C. § 541. "The [Debtor In Possession] is a fiduciary for the bankruptcy estate and assumes virtually all of the rights and responsibilities of a bankruptcy trustee." *In re Bame*, 251 B.R. 367, 373 (Bankr. D. Minn. 2000)(*citing* 11 U.S.C. § 1107; *Wolf v. Weinstein,* 372 U.S. 633, 649–50 (1963); *Whyte v. Williams,* 152 B.R. 123, 127 (Bankr. N.D. Tex. 1992).

In this case, the Debtor In Possession is an individual. One of the most difficult concepts an individual Chapter 11 debtor has to grasp is that once he files bankruptcy he has a fiduciary duty to his creditors to act in the best interest of the bankruptcy estate. This means he must generally put the interests of his creditors ahead of his own interests. To accomplish his fiduciary responsibility, he must act in a transparent, forthright, and candid manner and work to benefit the bankruptcy estate even if that may be a detriment to him individually.

Mr. Breland has not been transparent, forthright, or candid. He has routinely altered his position with this Court to suit his purposes at the time. Mr. Breland stated multiple times under oath that only he and his small staff are qualified to handle the exceptionally complex nature of his business and that they do so above board and with the utmost transparency. Yet, when this Court ordered him to do so, he sought dismissal of his case based on "extreme hardship."

### Requests to Appoint Chapter 11 Trustee

Section 1104 states that after commencement of a case, but before confirmation of a plan, upon the request of an interested party, and after notice and a hearing, the court shall order the appointment of a trustee for cause including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current

management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or if such appointment is in the interests of the creditors, equity security holders and the estate. 11 U.S.C § 1104(a).

"There is a strong presumption in Chapter 11 cases that a debtor in possession should remain in possession absent a showing of the need for a trustee." *In re Brenda's Rentals, LLC,* 2014 WL 1675881, at *3 (Bankr. N.D Ala. Apr. 28, 2014). "This presumption is based on the belief that the debtor in possession is the most knowledgeable about, and best able to run, the debtor's business." *Id.* "Because the appointment of a trustee is such an extraordinary remedy, the moving party must show that cause for appointment of a trustee exists by clear and convincing evidence." *Id.* The decision whether to appoint a trustee is fact intensive and the determination must be made on a case-by-case basis." *Id.* "The use of the word, "shall" leaves no discretion in appointment once cause is found." *Id.* "While appointment is mandatory once cause is found, it is within the court's discretion, on a case-by-case basis, to determine whether conduct rises to the level of cause." *Id.* "[A]ppointment of a trustee is a power which is critical for the [c]ourt to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." *In the Matter of Intercat, Inc.,* 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

## § 1104(a)(1) Enumerated Factors

"Cases interpreting the scope of the provisions of Section 1104 have been ruled on by a number of appellate courts, although there is no Eleventh Circuit authority in this area." *Id.* "A review of the appellate decisions reveals common threads." *Id.* "The

decision whether to appoint a trustee is vested in the discretion of the bankruptcy court and will be reviewed on an abuse of discretion standard." *Id.* "The inquiry into whether 'cause' exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to 'similar cause.'" *Id.* Factors which other courts in this Circuit have considered include: "(1) materiality of the misconduct; (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers; (3) the existence of pre-petition voidable preferences or fraudulent transfers; (4) unwillingness or inability of management to pursue estate causes of action; (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; (6) self-dealings by management or waste or squandering of corporate assets."

Beginning with the factors enumerated by the Code, the Court finds that clear and convincing evidence has been presented that cause exists to appoint a trustee for the reasons set out below. Though many of the facts relevant to each factor overlap, the Court will make a finding as to each factor separately.

*Fraud*

This factor weighs in favor of appointment. As demonstrated herein, on the eve of unfavorable jury verdicts being entered against him, Mr. Breland created a network of corporations and LLCs to shield his assets from collection. He transferred substantial assets to insiders using these entities thereby creating a tangled web of potentially fraudulent transfers that impeded his creditors' efforts to collect on their debts against him.

27

At the hearings on the present pending Motions, Mr. Breland took his oath and swore or affirmed that he would tell the truth regarding the questions asked of him. Yet, on a repeated basis, Mr. Breland either could not or would not answer questions regarding the alleged fraudulent transfers. In doing so, he presented himself as being generally unaware of how, when, why, and to whom certain transactions were made, and passed the buck to his staff regarding the knowledge and maintenance of these dealings. Mr. Breland also encumbered some of these properties with mortgages on the eve of the jury verdict.

*Dishonesty*

This factor weighs in favor of appointment. Considering this case as a whole, Mr. Breland has taken inconsistent positions regarding his involvement in the ordinary course of his business operations, leading this Court to conclude that at least some dishonesty is present. On one hand, Mr. Breland has been presented as a sophisticated businessman that almost singlehandedly runs an extremely complicated real estate business that only he and his small staff are equipped to do. Then, on the other hand, during his testimony under oath, he stated that he is so disengaged and uninvolved in his corporate business affairs that he was completely unable to answer even basic questions about his business due to his alleged lack of knowledge. This Court finds that Mr. Breland's testimony lacks credibility and finds such inconsistent positions to be disingenuous.

*Incompetence or Gross Mismanagement of Debtor's Affairs*

This factor weighs in favor of appointment. The fact that Mr. Breland apparently does not maintain or does not have access to important business records relating to many transactions he was questioned about raises critical concern over how he will continue to

comply with this Court's reporting orders in a way that provides his creditors with an accurate picture of his income, expenses, and business dealings. Thus, the Court finds that clear and convincing evidence has been presented demonstrating gross mismanagement of his real estate business.

Additionally, the fact that Mr. Breland previously filed bankruptcy in 2009 indicates that he is aware of, but is essentially refusing, to comport with duties of financial reporting and transparency required by the Code.

Therefore, applying all of the enumerated factors in § 1104 to the evidence and testimony presented, the Court finds there is clear and convincing evidence that cause exists to appoint a trustee. However, in the event that it could be found that the factors set out in § 1104(a)(1) do not rise to the level of cause sufficient to support the appointment of a trustee, this Court finds that the § 1104(a)(2) interests of the creditors test merits the appointment of said trustee.

### § 1104(a)(2) Interests of the Creditors Test

Subsection (a)(2) applies where a trustee would better serve the interests of creditors and other interested parties. Mr. Breland's systematic siphoning of assets to other companies in common control on the eve of multiple unfavorable jury verdicts, and on the eve of bankruptcy raises grave concerns about his ability to act in the interest of his creditors. Mr. Breland has not volunteered to rescind any of the transactions he orchestrated, nor has he agreed to investigate whether those transactions should be rescinded. In fact, he has refused to do so, and his creditors currently have motions pending before the undersigned for the authority to pursue those investigations by filing various adversary proceedings.

29

As set forth above, Mr. Breland's failures to disclose and his inaccurate and inconsistent disclosures are so extensive that they can only be the result of fraud, dishonesty, or gross mismanagement. Because such disclosures are essential to the Court's and the creditors' understanding of Mr. Breland's businesses and the monitoring of his assets, including the assets of the entities closely affiliated with him, the inaccuracies, omissions, and obfuscations alone justify the appointment of a trustee. As evidenced by the conflicting positions he has taken with regard to the state court's jurisdiction to enforce the *Breland, I* Plan as well as the varying values he places on his assets depending on the circumstances, Mr. Breland seems to be willing to say whatever is convenient for his position at the time, regardless of whether his prior statements were made under oath.

A person's opportunity to file bankruptcy is intended to provide a shield that allows a fresh start to the honest, but unfortunate debtor, and to provide fair treatment to all of the debtor's creditors through liquidation or reorganization. It is not intended to provide him with a sword to frustrate and evade his creditors. Mr. Breland's behavior does not comport with the judicious, economic and fair administration of his estate as required by the Bankruptcy Code. Applying § 1104(a)(2), this Court finds by clear and convincing evidence that the interests of the creditors will be better served by the appointment of a trustee.

*Additional Factors*

"Cases interpreting the scope of the provisions of § 1104 have been ruled on by a number of appellate courts, although there is no Eleventh Circuit authority in this area." *In the Matter of Intercat, Inc.,* 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000). The inquiry

Case 16-02272   Doc 382   Filed 04/28/17   Entered 05/01/17 09:30:16   Desc Main
Document      Page 30 of 34

into whether "cause" exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to 'similar cause' including the additional factors set out below.

Materiality of the Misconduct

This factor weighs in favor of appointment. As set out herein, Mr. Breland failed to comply with this Court's order as to the reporting requirements of Eigenkapital. On more than one occasion, Mr. Breland's creditors have had to seek judicial intervention to obtain any information involving this entity. Mr. Breland's failure to obey orders of this Court is cause by itself to appoint a trustee.

Additionally, Mr. Breland's bold transfer of so many properties out of the reach of potential judgment creditors on the eve of multiple trials is likewise material in this Court's consideration of his misconduct. The evidence is clear and convincing that nearly every action Mr. Breland has taken since those trials started has been to frustrate his creditors. Therefore, the Court finds that Mr. Breland's actions prior to and during this bankruptcy case are not mere mistakes, misunderstandings or lapses in judgment; instead they demonstrate misconduct so material to the administration of his estate that they warrant the appointment of a trustee.

Evenhandedness or Lack of Same in Dealings with<br>Insiders or Affiliated Entities Vis-a-vis Other Creditors or Customers

This factor weighs in favor of appointment. The numerous transfers between Mr. Breland and the affiliated entities and among the affiliated entities are the result of a lack of evenhandedness and self-dealing. According to his BA-1 and 2015.3 Reports, those transfers include what purport to be loans to insolvent entities and entities with no sources of repayment. If those reports are inaccurate or cannot be trusted, or worse, if

31

they are accurate, they are more evidence of fraud, dishonesty, or mismanagement. In any event, it is the debtor's obligation to present his financial condition in a manner that creditors can understand and it is not the creditors' obligation to ferret out discrepancies, mistakes, omissions, and misrepresentations in the debtor's financial statements. Those transfers additionally demonstrate that Mr. Breland treats insiders and his affiliated entities more favorably than he treats his creditors.

The Existence of Pre-Petition Voidable Preferences
or Fraudulent Transfers

This factor weighs in favor of appointment. Mr. Breland made numerous transfers to affiliated persons and entities to which the badges of actual fraud under state law or the Bankruptcy Code could be applied and result in numerous fraudulent transfer judgments. By transferring his real property to entities in the face of potential judgments, he has precluded his creditors from executing on the real property and relegated them to relying on charging orders to collect their debts. The Hudgens Creditors have made a demand upon Mr. Breland to pursue these alleged fraudulent transfer claims. He has refused to do so.

Unwillingness or Inability of Management to Pursue
Estate Causes of Action and
Conflicts of Interest on the Part of Management
Interfering with Its Ability to Fulfill Fiduciary Duties to the Debtor

These two factors are only tentatively applicable a this point. Because Mr. Breland is an individual who is the debtor-in-possession, the conflicts of interest on the part of managment factor does not apply directly to him, but he nonetheless owes fiduciary duties to his creditors. The dispute between Mr. Breland and the Hudgens Creditors regarding whether Mr. Breland obligated himself to deliver a promissory note

32

to the Hudgens Creditors under the *Breland, I* Chapter 11 Plan remains to be determined, making this factor less relevant in this analysis. Regardless, the Court notes there is great animosity between Mr. Breland and the Hudgens Creditors on this issue creating concern over whether Mr. Breland would be willing or able to pursue estate causes of action. Additionally, Mr. Breland is the sole owner, or co-owner, of various affiliated entities to which assets were transferred prior to filing bankruptcy creating a conflict between his position as debtor in possession and in his potential position as the defendant in a fraudulent transfer action.

Self-dealings by Management or Waste
or Squandering of Corporate Assets

This Court finds this factor does not weigh in favor of appointing a trustee. To the Court's knowledge, Mr. Breland has not engaged in any waste or squandering of assets or property of the estate.

CONCLUSION

In sum, Mr. Breland's payments on pre-petition debts without Court approval; payments to lawyers for post-petition work without Court approval; engagement and payment of substantial amounts of money to a "consultant" without Court approval; and the failure of his 2015.3 Reports to include Grand Bay 10, LLC or any information regarding Eigenkapital demonstrate substantial callousness toward the bankruptcy process and are a breach of his fiduciary duties under the bankruptcy code.

Therefore, having extensively considered the evidence and testimony presented, the argument of counsel, the motions and pleadings, and record before it, the Court finds the Hudgens Creditors' Motion to Appoint a Chapter 11 Trustee is due to be and hereby

33

is GRANTED on the grounds that cause exists by clear and convincing evidence to appoint a trustee.

Because this Court finds that the facts are such that the appointment of a trustee is warranted, the remaining Motions to Dismiss filed by both Levada and the Debtor are hereby DENIED.

The Bankruptcy Administrator is hereby ORDERED, as soon as is practicable, to nominate a qualified person to serve as the Chapter 11 Trustee in this matter in compliance with 11 U.S.C. § 1104(d) and Fed. R. Bankr. P. 2007.1.

Dated: April 28, 2017

_____
JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE